**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| T-Mobile West Corporation,<br><br>                  Plaintiff,<br><br>vs.<br><br>Michael M. Crow, et al.,<br><br>             Defendants. | No. CV08-1337-PHX-NVW<br><br>**ORDER** |

Before the Court is Plaintiff's Motion for Partial Summary Judgment on Its First and Fourth Claims for Relief (doc. # 90).

LRCiv 56.1(d) permits the moving party to file a "reply memorandum," but does not permit the moving party to file a separate statement responding to the nonmoving party's separate statement of facts. Any evidentiary objections to the nonmoving party's separate statement may be included in the reply memorandum, but may not be made in a separate statement. Therefore, the Court disregards and does not rely upon Plaintiff's Response to Defendants' Statements of Supplemental and Controverting Facts (doc. # 110).

**I.    Legal Standard for Summary Judgment**

Summary judgment is proper if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must produce evidence and show there is no genuine

issue of material fact. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To defeat a motion for summary judgment, the nonmoving party must show that there are genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A material fact is one that might affect the outcome of the suit under the governing law. *Id*. at 248. A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The party seeking summary judgment bears the initial burden of identifying the basis for its motion and those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its burden, the nonmoving party must produce evidence to support its claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*

On summary judgment, the nonmoving party's evidence is presumed true, and all inferences from the evidence are drawn in the light most favorable to the nonmoving party. *Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987). If the nonmoving party produces direct evidence of a genuine issue of fact, the Court does notweigh such evidence against the moving party's conflicting evidence, but rather denies the motion and leaves the issue to the trier of fact for resolution. *Id.*

**II.     Facts Presumed to Be True for Deciding T-Mobile's Motion for Partial Summary Judgment**

**1.     The Parties**

Plaintiff T-Mobile West Corporation ("T-Mobile") operates on assigned frequencies pursuant to licenses issued to related entities by the Federal Communications Commission ("FCC") for the provision of Commercial Mobile Radio Service ("CMRS or "wireless service") over a wireless telecommunications network within Arizona. T-Mobile provides CMRS in Tempe, Arizona. It is the successor to VoiceStream PCS III Corporation for the Computing Commons Building Site License Agreement ("Computing Commons SLA") at issue in this litigation. T-Mobile uses its Computing Commons antenna facility, which it constructed and owns, to transmit signals on licensed radio frequencies to provide wireless service to T-Mobile subscribers on Arizona State University's Tempe Campus.

Arizona State University ("ASU") is a public educational institution located in the State of Arizona. Defendant Arizona Board of Regents is a body corporate, for and on behalf of ASU, with jurisdiction and control over all State universities, including ASU, Northern Arizona University in Flagstaff, Arizona, and the University of Arizona in Tucson, Arizona, as well as all satellite locations of these universities. Defendant Michael M. Crow is the President of ASU. Numerous ASU students reside in ASU-owned residential halls located on ASU's Tempe Campus and pay ASU rent. Memorial Union, which is located on the Tempe Campus, serves as a campus community center and hosts commercial tenants.

Defendant NextG Networks, Inc., operates locally regulated telecommunications companies, such as Defendant NextG Networks of California, Inc., that design, permit, build, own, operate, and manage public fiber-optic based networks throughout the United States. Among other things, NextG Networks, Inc., and NextG Networks of California, Inc. (collectively "NextG") design, permit, build, own, operate, and manage Distributed Antenna System ("DAS") networks. NextG is a "common carrier" as that term is defined

in the Communications Act, 47 U.S.C. § 153(10). NextG holds a Certificate of Convenience and Necessity from the Arizona Corporation Commission to provide private line and intrastate access service in the State of Arizona.

**2.    The Technology**

A Distributed Antenna System is a network of spatially separated, low power antenna nodes connected to a common source via a transport medium that provides wireless service within a geographic area or structure. The nodes, which constitute the front end of the wireless network, are attached to structures (usually utility poles or buildings) and connected by fiber optic cables that terminate at a centralized base station, which acts as the back-end of the wireless network. The nodes receive signals and transmit signals to the base station where the signals are returned to the wireless carrier. The base station includes switching hubs or base station processing equipment owned and operated by the individual wireless carriers.

NextG provides telecommunications services to wireless carriers as a carrier's carrier, which means that NextG's service consists of providing transport of NextG's customers' communications between points designated by the customer without alteration of the communication. NextG's customers typically are providers of retail wireless services. Through a DAS, NextG's service involves a communication signal handed off from NextG's customer to NextG that NextG transports over its DAS. This hand-off and transport takes place at and through the antenna nodes located on utility poles or buildings. A node in NextG's network typically includes a small, low-power antenna, amplifier equipment, fiber optic lines, and additional equipment, all of which are owned, operated, and managed by NextG. NextG does not hold wireless licenses or provide wireless service. Instead, NextG provides wholesale telecommunications services to licensed wireless carriers through its DAS network architecture.

NextG's Distributed Antenna System network is protocol neutral, *i.e.*, the same equipment can be used to transport signals from multiple wireless carriers using different protocols and technologies. NextG's DAS also is provider neutral, *i.e.*, the antennas are

capable of transmitting different digital signals on multiple frequency bands simultaneously, which allows the DAS to serve all wireless carriers.

T-Mobile may provide service to its wireless customers on the Tempe Campus from antennas located elsewhere without using the NextG DAS. T-Mobile does not contend on this motion that it cannot use the NextG DAS to deliver T-Mobile's desired level of wireless services or that using the NextG DAS will place T-Mobile at a competitive disadvantage or limit consumer choice of wireless service.

**3.     Events Leading to the Current Dispute**

ASU manages multiple contracts with multiple wireless carriers with multiple equipment stations in multiple locations on the Tempe Campus. Prior to execution of the Campus Use Agreement ("CUA") between NextG and ASU, requests for placement and operation of telecommunications equipment on the Tempe Campus required involvement of numerous departments, including Information Technology, Purchasing and Business Services, University Architecture, and the University Fire Marshal. The approval and issuance process for a Site License Agreement ("SLA") required participation and approval of these separate and distinct University departments. Officials in ASU's technology and purchasing departments decided that instead of continuing to manage multiple agreements with multiple wireless carriers, ASU should select a single vendor to provide a Distributed Antenna System to which each wireless carrier could connect. In addition to simplifying management of carrier relationships, ASU sought to enhance wireless service on campus, lessen the negative aesthetic impact from having each carrier place its own antenna system on campus, and receive an increased revenue stream.

In December 2006, ASU issued Request for Proposal No. 020703, entitled "Design, Installation, and Management of a Neutrally-Hosted Common Network Wireless Communications Distributed Antenna System" ("RFP"). The RFP was sent to Verizon, Sprint, NextG, NewPath, Alltel, Cingular, T-Mobile, and Cellular Specialties. ASU received responses from NextG, NewPath, Sprint, and a Wireless Carrier Team consisting of Verizon and T-Mobile. A committee of ASU employees evaluated the responses to the

RFP. In June 2007, ASU announced that the contract would be awarded to NextG. In October 2007, the Arizona Board of Regents, for and on behalf of ASU, and NextG Networks of California, Inc., d/b/a NextG Networks West, entered into the Campus Use Agreement that resulted from the procurement carried out pursuant to the RFP, under which NextG is to provide and maintain a Distributed Antenna System network on ASU's campuses and execute contracts with wireless carriers to utilize the DAS.

In January 2008, ASU provided to T-Mobile and other wireless carriers a memorandum regarding ASU's contract with NextG for the Distributed Antenna System. In March 2008, T-Mobile requested that ASU permit T-Mobile to extend the Computing Commons Site License Agreement until the DAS system is fully functional and ready for a complete cutover, continue use of the Computing Commons as a base station equipment cabinet location for the future DAS facility, and continue use of the regular macro cell sites at both the golf course east of the Tempe Campus and the water tank site at ASU East as long as T-Mobile participates in the DAS system for the Tempe Campus. T-Mobile stated it would take approximately sixty to ninety days for T-Mobile to "fully cut everything over to the DAS system" once the DAS system is fully functional. Two weeks later, ASU responded that ASU was agreeable to continuing T-Mobile's Computing Commons Site License Agreement on a month-to-month basis until the DAS network was operational, "assuming T-Mobile continues to use their best efforts to move the DAS forward." ASU also agreed to permit T-Mobile to use the Computing Commons location as a base station equipment cabinet for the DAS system in conjunction with the NextG plan proposal. In June 2008, ASU formally notified T-Mobile that the Computing Commons SLA was expiring June 30, 2008, ASU elected not to renew the Computing Commons SLA, and ASU would extend it on a month-to-month basis under the same terms and conditions until ASU elects to terminate the month-to-month agreement with thirty-day written notice.

In July 2008, NextG submitted a proposal to T-Mobile to permit T-Mobile to use the DAS to be installed by NextG in providing wireless service on campus. T-Mobile has

not accepted NextG's and ASU's proposals to allow T-Mobile access to NextG's DAS, and T-Mobile has not undertaken any further efforts to subscribe to the DAS to be installed by NextG. There is no suggestion of any technological incompatibility between T-Mobile's service and NextG's DAS. T-Mobile provides wireless communications services to its customers using a NextG DAS at the University of California - Santa Cruz. T-Mobile provides wireless communications services to its customers in at least one location using a DAS operated and managed by entities other than NextG.

The Campus Use Agreement does not preclude wireless carriers from providing wireless services on ASU's campuses using equipment located elsewhere. It is technically feasible for T-Mobile to provide wireless services to customers on ASU's Tempe Campus using equipment located outside of ASU's Tempe Campus.

**4.     The Campus Use Agreement**

The Campus Use Agreement provides the following order of preference to be used in interpreting any ambiguity in the CUA:

1.      Arizona State University's Request for Proposal 020703, together with NextG's Response to [ASU's Request for ] Proposal dated January 29, 2007 (the "**NextG Response**");

2.      Any Network Order entered into pursuant to this Agreement; and

3.      This Agreement together with its attachments.

(Doc. # 84, Exh. CC at 1.)

As background, the CUA provides:

A.      University owns certain fiber optic cables and related conduit located over, under, on and through public and private easements and rights-of-way (the "**University Network**"), and NextG seeks to lease parts of the University Network (each part a "**Segment**") and University campus (the "**Campus**") for the placement and operation of NextG's distributed antenna system ("**Distributed Antenna System**"); and

B.      In connection with NextG's use of the University Network, NextG further seeks to obtain the right to market the Campus to wireless cellular telephone operators and other telecommunications carriers (each an "Operator" and collectively "Operators"); and

C.      University wishes to enter into an arrangement with NextG in order for NextG to manage (i) the Operators' use of the Campus, (ii) the Operators' connection to the Distributed Antenna System, and (iii)

the Operators' use of a "Co-Location Facility" (as defined below) where Operators may locate their equipment on Campus; and

D.  University is willing to lease NextG portions of the University and to grant NextG the right to market the Campus and Distributed Antenna System to Operators, all on the basis of terms and conditions set forth below.

(*Id.*)

Section 3 of the CUA requires NextG to "compensate the University for the use of the Leased Fiber and Node Spaces according to a five year revenue sharing model based upon revenue received by NextG from NextG's customers for the transport of radio frequency signals over the Leased Fibers." (*Id.* at 2.)  Under the CUA, NextG will pay the University 11% of the revenue received from the first Operator, 16% of the revenue from the second Operator, 22% of the revenue received from the third Operator, 30% of the revenue received from the fourth Operator, and 50% of the revenue received from the fifth Operator.  The CUA provides for additional revenue sharing if NextG manages a Co-Location Facility where Operators locate their equipment to provide signals to NextG's DAS.  (*Id.* at 2-3.)

Section 19 of the CUA provides that "University shall provide NextG and the Operators with access to the Campus as specified in the applicable Network Order." (*Id.* at 6.)  The Sample Network Order attached to the CUA states:

9.  Access.  University shall permit NextG unrestricted access to the Leased Fiber and Node Space[, and NextG and the Operators unrestricted access to the Co-Location Facility,] seven days a week, 24 hours a day.  To facilitate such 24/7/365 access, NextG shall have the right to install a lockbox at a mutually agreeable location or the parties shall make other appropriate arrangements.

*Id.* at Attachment 1.)

Section 20 of the CUA provides NextG with the exclusive right to place cell sites and the DAS on the Tempe Campus:

**Marketing Rights.**  University understands that NextG will be making a significant capital investment in the design, engineering and deployment of the Distributed Antenna System and that the success of [the] revenue sharing model contemplated in Section 3 above is premised upon referral and cooperation between NextG and University.  Furthermore, University enjoys a significant financial incentive in having multiple Operators on the

- 8 -

Distributed Antenna System combined with the convenience of having NextG manage the needs of such multiple Operators. Therefore University hereby grants to NextG for the Term of this Agreement, the exclusive right to place cell sites and fiber-based distributed antenna systems on the Campus. Accordingly, University shall refer all inquiries received from Operators for the placement of cell sites or fiber-based distributed antenna systems on the Campus to NextG.

(*Id.* at 6.)

Section 40 of the CUA provides:

**Entire Agreement.** The attachments hereto are hereby incorporated by reference. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter contained in this Agreement and supersedes any and all prior negotiations, understandings and agreements between the Parties, whether oral or written. In the event of a conflict between the terms of this Agreement and any Network Order, Order of Preference shall control.

(*Id.* at 13.)

The RFP states that the services to be provided by the selected vendor include: "(1) design the [DAS]; (2) acquire and install the DAS; (3) market and support wireless carrier use of the DAS; and (4) operate and maintain the DAS." (Doc. # 84, Exh. U, at 1.) "These services should be provided for minimal or no cost to the University with possible revenue generation for the University." (*Id.*) The RFP also states:

. . . The selected wireless proposer will be the primary cellular provider for the campus, but will not be the exclusive provider. Therefore it will be important for the successful proposer for this solicitation to work closely with the University partner as well as establish relationships with various other providers.

While it is the intent of this RFP to grant a contract for all of the University campuses[,] there currently exist telecommunications lease agreements for wireless carrier sites already installed on the campus. The University reserves the right to continue the existing agreements for cell sites, authorize the wireless carrier to terminate its sites amendments in exchange for entering into an agreement with the Contractor, transfer the wireless carrier agreement(s) to the Contractor, or enter into new agreements when necessary.

(*Id.* at 6, 7.) The RFP further states, "The DAS must accommodate any commercial wireless carrier on University property to enhance coverage, especially in-building penetration, and network capacity." (*Id.* at 16.)

NextG's Response to the RFP states:

- 9 -

Each NextG DAS-Network is in essence an agnostic "pipeline" enabling any RF signals to be transported to specified locations within a 10-mile distance from the "Hub" location. The transport of RF frequencies each NextG DAS can support is limited to the DAS hardware produced by equipment manufacturers. Currently, any frequency in the 400 MHz to 2.5 Ghz can be supported via DAS hardware. This will support all licensed and most unlicensed frequencies. . . .

The NextG DAS-Networks are capable of, will currently and always meet each campus's requirements. Requirements, which consist of providing ubiquitous and robust outdoor wireless coverage for all current and future carrier frequencies and maximum in-building wireless penetration when designed according to each particular operator's requirements (coverage & capacity needs, RF plan, addition of new protocols and applications due to emerging technologies, the purchase of frequencies, operator mergers and acquisitions, etc.). Every NextG on-air network has met and/or exceeded operator expectations as well as the needs of the entity where the network is implemented.

(Doc. # 84, Exh. W, at 26.)

**III.     Analysis**

    **A.     First Claim for Relief (Against NextG):  Violation of 47 U.S.C. § 201(b)**

Section 201 provides:

(a)  It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor. . . .

(b)  All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful. . . .

47 U.S.C. § 201.  To decide whether a practice is unjust or unreasonable under § 201(b), the Court gives considerable weight to the FCC's interpretation of a statutory scheme it is entrusted to administer.  *See Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 844 (1984).

    The FCC has determined that a telecommunications carrier's agreement to an exclusive contract with either a commercial or a residential multiple tenant environment for the provision of telecommunications service is an unreasonable practice under § 201(b).  *Promotion of Competitive Networks in Local Telecommunications Markets*, First Report and Order and Further Notice of Proposed Rulemaking, 15 F.C.C.R. 22983, 23000, ¶ 35 (2000) ("*Commercial MTE Order*"); *Promotion of Competitive Networks in*

*Local Telecommunications Markets*, Report and Order, 23 F.C.C.R. 5385, 5391, ¶ 15 (2008) ("*Residential MTE Order*").  A "multiple tenant environment" ("MTE") is "any contiguous premises under common ownership or control that contains two or more distinct units occupied by different tenants," such as an apartment building, office building, or shopping center.  *Commercial MTE Order*, 15 F.C.C.R. at 22992, ¶ 15.

The FCC therefore has prohibited certain agreements:

> (a) No common carrier shall enter into any contract, written or oral, that would in any way restrict the right of any commercial multiunit premises owner, or any agent or representative thereof, to permit any other common carrier to access and serve commercial tenants on that premises.

> (b) No common carrier shall enter into or enforce any contract, written or oral, that would in any way restrict the right of any residential multiunit premises owner, or any agent or representative thereof, to permit any other common carrier to access and serve residential tenants on that premises.

47 C.F.R. § 64.2500.

## 1.    NextG Is a "Telecommunications Carrier."

It is undisputed that NextG is a "common carrier."  "Telecommunications" means "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."  47 U.S.C. § 153(43).  "Telecommunications carrier" means "any provider of telecommunications services."  47 U.S.C. § 153(44).  "Telecommunications service" means "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."  47 U.S.C. § 153(46).  The FCC has interpreted "telecommunications service" to include both retail and wholesale services:

> The Commission has previously held that the phrase "to the public" in the definition of "telecommunications service" does not mean a service must be offered to the entire public to qualify as a telecommunications service.  A service offered to a defined class of potential customers is a telecommunications service as long as the service provider "holds itself out indiscriminately to serve all within that class."  To qualify as a telecommunications carrier, companies only need to offer indiscriminate service to whatever public their services may legally and practically be of use.

*Compass Global, Inc.*, 23 F.C.C.R. 6125, 6132-33 (2008) (footnotes omitted).  Thus, although NextG is a "carrier's carrier," it offers its service to a defined class of potential customers and "holds itself out indiscriminately to serve all within that class."  Therefore, NextG is a "telecommunications carrier" under § 153.

<strong>2.    ASU's Tempe Campus Is a "Multiunit Premises.</strong>"

A "multiunit premises" is "any contiguous area under common ownership or control that contains two or more distinct units."  47 C.F.R. § 64.2501.  The Tempe Campus is a contiguous area under the Arizona Board of Regents' control in which there are buildings with multiple units that house residential and commercial tenants.  The Tempe Campus is therefore both a "multiunit premises" and a "multiple tenant environment."

<strong>3.    The Campus Use Agreement Violates Section 201(b) If It Effectively Restricts the Right of the Arizona Board of Regents to Permit Any Other Common Carrier to Access and Serve Tenants on the Tempe Campus.</strong>

T-Mobile paraphrases the FCC's rulings in the *Commercial MTE Order* and the *Residential MTE Order* as "it is an unreasonable practice under Section 201(b) for a telecommunications carrier to enter into a contract that restricts the ability of any owner of a multiple tenant commercial or residential property (described generally as a "multiple tenant environment" or "MTE") from permitting facilities-based entry by other carriers." (Doc. # 90 at 15.)  T-Mobile's interpretation expands the FCC's regulation prohibiting contractual restrictions that limit the building owner's right to permit any other common carrier to "access and serve" tenants to include restrictions of the building owner's right to permit any other common carrier to install certain types of telecommunications equipment even if it does not limit consumer choice or adversely affect competition among those providing telecommunications services to consumers.  The *MTE Orders* do not go that far.

In the *Commercial MTE Order*, the FCC "prohibit[ed] carriers from entering into contracts that restrict or effectively restrict owners and managers of commercial MTEs

- 12 -

from permitting access by competing carriers." *Commercial MTE Order*, 15 F.C.C.R. at 22985, ¶ 1. The FCC explained the pro-competitive purpose of the Telecommunications Act of 1996:

> 3. In the 1996 Act, Congress sought "to provide for a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." One of the most important goals of the 1996 Act was to bring competition to the traditionally monopolistic market for local telecommunications services. In order to bring competition to this market, Congress contemplated competitive entry by three means – use of a competitor's own facilities, use of unbundled elements of the incumbent local exchange carrier's (LEC's) network, and resale of the incumbent's service – and it included provisions to prevent incumbent LECs from blocking competitive entry by any of these means. . . .

> 4. We remain committed to removing obstacles to competitive entry into local telecommunications markets by any of the avenues contemplated in the 1996 Act. Nonetheless, we have recognized that the greatest long-term benefits to consumers will arise out of competition by entities using their own facilities. Because facilities-based competitors are less dependent than other new entrants on the incumbents' networks, they have the greatest ability and incentive to offer innovative technologies and service options to consumers. Moreover, facilities-based competition offers the best promise of ultimately creating a comprehensive system of competitive networks, in which today's incumbent LECs no longer will exert bottleneck control over essential inputs, but will compete on a more equal basis with their rivals.

*Id.* at 22986-87, ¶¶ 3-4 (footnotes omitted). In the *Commercial MTE Order*, "facilities-based competitors" refers to competitors that use their own networks as distinguished from those that use unbundled elements of the incumbent LEC's network or resell the incumbent's service in the context of "bring[ing] competition to the traditionally monopolistic market for local telecommunications services," not wireless telecommunications services. Further, the *Commercial MTE Order* forbids telecommunications carriers from entering into contracts to serve commercial properties that restrict or effectively restrict the property owner's ability to permit "access" or "entry" by other carriers, not the owner's ability to permit other carriers to locate their facilities on the property.

- 13 -

Although the FCC seeks to "support the overarching goal of encouraging facilities-based competition in the wireless market," it declined to impose automatic roaming obligations that could undermine providing wholesale services to other carriers. *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers*, Report and Order and Further Notice of Proposed Rulemaking, 22 F.C.C.R. 15817, 15883 (2007). The FCC refused to *require* a Commercial Mobile Radio Service carrier to provide automatic roaming to a requesting CMRS carrier in a market where the CMRS carrier directly competes with the requesting CMRS carrier because doing so could harm facilities-based competition and remove incentives for carriers to build out their own networks. Yet the FCC did not *prohibit* requesting carriers and host carriers from negotiating roaming agreements, including automatic roaming in overlapping geographic markets. *Id.* at 15835, ¶¶ 48-49. It cannot be assumed, therefore, that § 201(b) prohibits any agreement that would restrict the building owner's right to permit wireless carriers to place antennas and other equipment on the owner's property even if the agreement could harm facilities-based competition.

Moreover, the FCC did not include any reference to "facilities-based" in its Rule adopted pursuant to the *MTE Orders*. It prohibited only restrictions on "the right of any [] multiunit premises owner, or any agent or representative thereof, to permit any other common carrier to access and serve []tenants on that premises." 47 C.F.R. § 64.2500. Accessing and serving tenants is not synonymous with "facilities-based entry."

The FCC's prohibition of exclusive contracts includes those that effectively restrict a building owner from providing access to any other telecommunications service provider:

> We emphasize that the prohibition on future exclusive contracts that we adopt today applies to all common carrier contracts . . . that effectively restrict a building owner or its agent from providing access to any other telecommunications service provider. Thus, by "exclusive contract" we do not mean only a contract that gives the contracting provider the sole right to serve a building. Rather, we also proscribe, for instance, a contract with a competitive LEC that could permit access to that party and the incumbent, but deny access to any other competitor. Similarly, we forbid any contract that would limit access to providers using a particular technology. In

- 14 -

addition, we emphasize that contracts between building owners and local carriers that do not explicitly deny access to competing carriers, but nonetheless establish such onerous prerequisites to the approval of access that they effectively deny access, are also prohibited.

*Commercial MTE Order*, 15 F.C.C.R. at 23000-01, ¶ 37 (footnotes omitted).

Therefore, the Campus Use Agreement violates 47 U.S.C. § 201(b) if it effectively restricts the right of the Arizona Board of Regents to permit any other common carrier to access and serve tenants on the Tempe Campus.

**4. The Campus Use Agreement Does Not Restrict the Right of the Arizona Board of Regents to Permit Any Other Common Carrier to Access and Serve Tenants on the Tempe Campus.**

Under the Campus Use Agreement, the Arizona Board of Regents unambiguously grants NextG "the exclusive right to place cell sites and fiber-based distributed antenna systems on the [Tempe] Campus." But the CUA anticipates multiple wireless carriers will use NextG's DAS to access and serve tenants on the Tempe Campus and will locate equipment in the Co-Location Facility on the Tempe Campus under NextG's management. Compensation to ASU is based on revenue NextG receives from the wireless carriers and increases with the number of carriers using NextG's DAS. The CUA does not limit the number or types of wireless carriers that may access and serve Tempe Campus tenants with or without use of NextG's DAS. However, the CUA expressly restricts ASU's right to "place cell sites and fiber-based distributed antenna systems" on the Tempe Campus and requires ASU to refer to NextG all inquiries received from wireless carriers for the placement of cell sites or fiber-based distributed antenna systems on the Tempe Campus.

To the extent the Campus Use Agreement is ambiguous regarding whether the CUA limits access to tenants by wireless carriers using a particular technology or restricts ASU's right to permit any wireless carrier to access and serve Tempe Campus tenants, the RFP and NextG's Response to the RFP may be considered. The RFP requires that the Distributed Antenna System accommodate any commercial wireless carrier on the Tempe Campus to enhance coverage and network capacity. NextG's Response states that its

DAS will provide "ubiquitous and robust outdoor wireless coverage for all current and future carrier frequencies and maximum in-building wireless penetration when designed according to each particular operator's requirements." Thus, the CUA may be interpreted as permitting any wireless carrier to use NextG's DAS to access and serve Tempe Campus tenants.

The RFP also provides that ASU "reserves the right to continue the existing agreements for cell sites, authorize the wireless carrier to terminate its sites amendments in exchange for entering into an agreement with [NextG], transfer the wireless carrier agreement(s) to [NextG], or enter into new agreements when necessary." ASU's reservation of rights in the RFP, however, does not supersede the CUA's unambiguous grant to NextG of "the exclusive right to place cell sites and fiber-based distributed antenna systems on the [Tempe] Campus." Therefore, ASU's reservation of rights must be interpreted as permitting ASU to continue existing agreements for cell sites and to enter into new agreements to place equipment other than "cell sites and fiber-based distributed antenna systems."

To prevail on its motion for summary judgment, T-Mobile must show that, as a matter of law, granting NextG the exclusive right to place new cell sites and fiber-based distributed antenna systems restricts the Arizona Board of Regents' right to permit some wireless carriers to access and serve Tempe Campus tenants. NextG's DAS network can be used to transport signals from multiple wireless carriers using different protocols and technologies and can transmit different digital signals on multiple frequency bands simultaneously, which allows the DAS to serve all wireless carriers. T-Mobile does not contend that using NextG's DAS will place it at a competitive disadvantage or limit consumer choice of wireless service. T-Mobile does not contend that not being permitted to place its own antennas on the Tempe Campus will prohibit it from accessing and serving Tempe Campus Tenants. In fact, T-Mobile agrees that it and other wireless carriers may provide service to Tempe Campus tenants from antennas located elsewhere without using NextG's DAS. Thus, on this record, the CUA does not effectively restrict

the right of ASU to permit any wireless carrier to access and serve tenants on the Tempe Campus and, therefore, does not violate § 201(b).

### B. Fourth Claim for Relief (Against ASU Defendants): Preemption Under 47 U.S.C. § 253(a)

Section 253(a) provides:

> No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

47 U.S.C. § 253(a). If the FCC "determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the [FCC] shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency." 47 U.S.C. § 253(d).

### 1. Section 253(a) Preempts the Campus Use Agreement Only If It Prohibits or Has the Effect of Prohibiting the Provision of "Personal Wireless Services."

"[E]xpress preemption statutory provisions should be given a narrow interpretation." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 496 (9th Cir. 2005); *accord Sprint Telephony PCS, L.P., v. County of San Diego*, 543 F.3d 571, 578 (9th Cir. 2008) (en banc). "[W]here the federal statute contains a provision explicitly addressing preemption, and when that provision provides a reliable indicium of congressional intent with respect to state authority, preemption is restricted to the terms of that provision." *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 415 (2d Cir. 2002) (internal quotation marks and citation omitted).

Section 253(a) prohibits a state legal requirement from prohibiting, or having the effect of prohibiting, the ability of any entity to provide "any interstate or intrastate telecommunications service." "Telecommunications service" means "the offering of telecommunications for a fee directly to the public . . .regardless of the facilities used." 47 U.S.C. § 153(46). Thus, "telecommunications service" may include, but is not limited to, providing services using end-to-end facilities entirely under the control of the carrier.

- 17 -

However, § 332, enacted at the same time as § 253(a), distinguishes between "personal wireless service" and "personal wireless service facilities." 47 U.S.C. § 332. Section 332 provides that "nothing in this chapter," which includes § 253(a), "shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities" except if the regulation prohibits or has the effect of prohibiting "the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(A), (B)(i)(II). The term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services. The term "personal wireless service facilities" means facilities for the provision of personal wireless services. 47 U.S.C. § 332(c)(7)(C). When two statutes were enacted at the same time and form part of the same Act, "the duty to harmonize them is particularly acute." *U.S. West Communications, Inc. v. Hamilton*, 224 F.3d 1049, 1053 (9th Cir. 2000); *see also Sprint Telephony*, 543 F.3d at 579 (holding the legal standard under § 253(a) is the same as that of § 332). In order to harmonize §§ 253(a) and 332, § 253(a) must be interpreted as not preempting a decision regarding the placement, construction, and modification of personal wireless service facilities unless the decision prohibits or has the effect of prohibiting the provision of personal wireless services, which is distinct from personal wireless service facilities.

The FCC's 1997 interpretation of § 253(a) as barring "state or local requirements that restrict the means or facilities through which a party is permitted to provide service, *i.e.*, new entrants should be able to choose whether to resell incumbent LEC services, obtain incumbent LEC unbundled network elements, utilize their own facilities, or employ any combination of these three options," is not applicable here. *See In the Matter of the Public Utility Commission of Texas*, 13 F.C.C.R. 3460, 3496, ¶ 74 (1997). The issue before the FCC was not whether a state must permit a carrier to use its own facilities exclusively, but rather whether a state may restrict a new entrant's use of resale or incumbent LEC unbundled network elements in the provision of service. *Id.* at 3497,

¶ 76.  The FCC reasoned that § 253(a) must be read in light of § 251, which imposes obligations on incumbent LECs to enable new competitors to enter local markets by, among other things, obtaining unbundled network elements and purchasing incumbent LEC retail services at wholesale for resale to end users.  *Id.* at 3496-97, ¶ 75.  The FCC concluded that a state may not "require that an entity provide telecommunications services via its own facilities and limit the entity's ability to resell incumbent LEC services or restrict the use of unbundled network elements provided by the incumbent."  *Id.* at 3496, ¶ 74.  As an independent basis for preempting the Texas statute, the FCC further found that enforcement of the statutory build-out requirements would have the effect of prohibiting new entrants from providing service contrary to § 253(a) due to the substantial financial investment involved.  *Id.* at 3498, ¶ 78.

Thus, § 253 will preempt the CUA only if the CUA prohibits or has the effect of prohibiting the provision of "personal wireless services," not "facility-based wireless services."

**2.      The Record Does Not Establish that the Campus Use Agreement Prohibits or Has the Effect of Prohibiting the Provision of Personal Wireless Services.**

To prove a violation of § 253(a), "a plaintiff must establish either an outright prohibition or an effective prohibition on the provision of telecommunications services; a plaintiff's showing that a locality could *potentially* prohibit the provision of telecommunications services is insufficient."  *Sprint Telephony*, 543 F.3d at 579.  As shown above, harmonizing §§ 253(a) and 332(c)(7) requires interpreting § 253(a) as not preempting a decision regarding the placement, construction, and modification of personal wireless service facilities unless the decision prohibits or has the effect of prohibiting the provision of personal wireless services, not facilities-based wireless services.

In 1999, the FCC declined to find that an agreement between the state and a developer was consistent with § 253(a) because the state had failed to demonstrate that the agreement did not prohibit or have the effect of prohibiting the provision of

competitive telecommunications services by certain entities and the agreement "appear[ed] to have the potential to adversely affect the provision of telecommunications services by facilities-based providers, in violation of the provisions of section 253(a)." *Petition of the State of Minnesota for a Declaratory Ruling Regarding the Effect of Section 253 on an Agreement to Install Fiber Optic Whole-Sale Transport Capacity in State Freeway Rights-of-Way*, Memorandum Opinion and Order, 14 F.C.C.R. 21697, 21700, ¶ 3 (1999). However, the FCC also declined to preempt the agreement because the potential adverse effects could be ameliorated, depending on how the agreement was implemented. *Id.* at 21700, ¶ 4. The agreement granted one developer exclusive physical access for ten years, with option to renew for another ten years, to state freeway rights-of-way to install fiber optic rings in three regions of Minnesota. *Id.* at 21702, ¶ 6. The FCC determined that the agreement created a "legal requirement" that prevented the state from granting potential competitors access to the freeway rights-of-way. *Id.* at 21707, ¶ 17. Because the developer could use its facilities along the rights-of-way to provide wholesale telecommunications capacity to others and retail telecommunications service through an affiliate, the FCC determined that the agreement had the potential to adversely affect competitors that did not have similar access. *Id.* at 21707, ¶ 19.

Here, the CUA grants NextG the exclusive right to place cell sites and fiber-based distributed antenna systems on the Tempe Campus, but it does not prohibit the provision of personal wireless services. The record does not show that the CUA will have the effect of prohibiting the provision of personal wireless services. The record does not show that the CUA will adversely affect NextG's competitors or adversely affect competition among wireless carriers. Therefore, it cannot be concluded as a matter of law that § 253(a) preempts the CUA.

**3.    The Campus Use Agreement Is a Proprietary Decision Not Subject to § 253(a).**

Section 253(a) prohibits any state or local statute, regulation, or other legal requirement that "prohibit[s] or ha[s] the effect of prohibiting the ability of any entity to

- 20 -

provide any interstate or intrastate telecommunications service."   However, "[n]ot all actions by state or local government entities . . . constitute regulation, for such an entity, like a private person, may buy and sell or own and manage property in the marketplace." *Sprint Spectrum*, 283 F.3d at 417; *accord Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1041 (9th Cir. 2007). A state or local government entity has the same right in its proprietary capacity as the property owner as does a private individual to refuse to agree to permit a wireless carrier to erect a cellular tower on its private property. *Sprint Spectrum*, 283 F.3d at 421. "[T]he Telecommunications Act does not preempt nonregulatory decisions of a local governmental entity or instrumentality acting in its proprietary capacity." *Id.* "Thus, even where a federal statute preempts state regulation in an area, state action in that area is not preempted so long as it is proprietary rather than regulatory." *Engine Mfrs.*, 498 F.3d at 1041; *see Building & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 231-32 (1993) ("In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction.").

> A state action is considered proprietary in either of two circumstances:
>
> First, state action is proprietary if it essentially reflects the governmental entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances. . . . Second, state action is proprietary if the narrow scope of the challenged action defeats an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem.

*Engine Mfrs.*, 498 F. 3d at 1041 (internal quotation and alteration marks; citations omitted). Both circumstances are present here. Officials in ASU's technology and purchasing departments decided ASU should select a single vendor to provide a Distributed Antenna System to which all wireless carriers could connect in order to reduce the resources ASU must expend planning, coordinating, and managing contracts with multiple wireless carriers and their equipment in multiple locations on the Tempe

Campus. ASU also sought to enhance wireless service on campus, lessen the negative aesthetic impact from having each carrier place its own antenna system on campus, and receive an increased revenue stream. ASU sought for itself both the efficient procurement of needed services and a narrow solution for specific proprietary problems. ASU's decision does not regulate placement of equipment outside of the Tempe Campus and does not restrict consumers' choice of personal wireless services.

Through the Campus Use Agreement with NextG, ASU will receive a DAS designed, installed, operated, managed, and paid for by NextG and a share of revenue generated from wireless carriers that use the DAS in exchange for granting NextG the exclusive right to "place cell sites and fiber-based distributed antenna systems" on the Tempe Campus for a five-year term with potential for renewal terms. ASU may continue any existing site license agreement with wireless carriers, but will no longer be burdened with planning and coordinating the siting of new cell sites. ASU expects to reduce the number of cell towers and antennas while at the same time enabling cell users to have better wireless service on the Tempe Campus.

Thus, the Arizona Board of Regents' grant of an exclusive right to NextG to install the DAS and manage facilities is the proprietary decision of a property owner, not a "regulation" or "legal requirement" under § 253(a). As an alternative ground, therefore, T-Mobile's motion will be denied because § 253(a) does not apply to Arizona Board of Regent's proprietary decision to enter into the CUA.

**C.     Fed. R. Civ. P. 56(f)**

Fed. R. Civ. P. 56(f) provides that if a party opposing a motion for summary judgment shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the Court may deny the motion, order a continuance, or issue any other just order. NextG filed an affidavit stating that it had not been able to conduct discovery related to issues raised in T-Mobile's motion for partial summary judgment. (Doc. # 106, Exh. 1.) Because the motion for partial summary judgment will be denied for other reasons, the Court need not decide any issues related to Rule 56(f).

IT IS THEREFORE ORDERED that Plaintiff's Motion for Partial Summary Judgment on Its First and Fourth Claims for Relief (doc. # 90) is denied.

DATED this 16th day of December, 2009.

_____
Neil V. Wake
United States District Judge